# Exhibit 4 to PLZ Corp.'s Memorandum of Law in Support of its Motion for Summary Judgment

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF GEORGIA
 3                       STATE OF GEORGIA
 4
                                          )
 5   BRIAN DICKERSON,                     )
                                          )
 6        Plaintiff,                      )
                                          ) CIVIL ACTION FILE NO.:
 7   vs.                                  ) 1:20-cv-03618-MHC
                                          )
 8
     PLZ AEROSCIENCE CORPORATION          )
 9   and HAZMAT EMERGENCY RESPONSE        ) VOLUME II
     AND REMEDIATION, INC.,               )
10                                        )
          Defendants.                     )
11
12
                       The DEPOSITION of:
13
                     BRYAN DURIG, Ph.D., P.E.
14
            Being taken pursuant to stipulations herein:
15
                    Before Kathryn Taylor, CCR
16
                      MONDAY, MARCH 14, 2022
17
                      Commencing at 3:05 p.m.
18
19
         All parties, including the court reporter, appeared by
20
              videoconference due to the COVID-19 pandemic.
21
22
      Job No. 5128279
23
24
25
                              Page 1
```

Page 30

1  statement that they had to fire watch out there the entire
2  time.
3      Q.  So -- so you're -- you would agree -- or your
4  opinion would be that fire -- the fire watch was
5  appropriately done over -- you know, during this job by CND?
6      A.  Correct.  And I think if you look at that permit,
7  when you get down to the very bottom, there's two signatures
8  on that that said it was.  So -- but we'll get to that when
9  you go down to the end of that first column.  But, yes, they
10 had fire extinguishers in there, and I think they had some
11 water hoses in the room for use.
12     Q.  Do you know who was holding the water hose when
13 Noel Dickerson started cutting?
14     A.  No.  I don't know.  I'd just say I know there was
15 hoses in the room.  I don't know if anybody was actually
16 spraying on there.  I don't think they would be spraying if
17 he's cutting.  They might have some water down on the ground
18 -- if we've got slag dripping down, they may be spraying some
19 water on the floor.  But I don't know that to be performed at
20 that time.  I'm just saying, I know there was mention of
21 having hoses in the room, as well as fire extinguishers.
22     Q.  All right.  And in the -- did you read the
23 Plaintiff's deposition in this case?
24     A.  Yes.
25     Q.  All right.  All right.  So in this instance, and

Page 31

1  tell me if this is wrong, is it your -- my understanding of
2  the testimony is that at the beginning of the -- I'll just
3  call it a shift -- but before the work was done, Mr. Dewayne
4  Miller and Noel Dickerson completed the pre-work checklist;
5  is that your understanding?
6      A.  Yeah.  I mean, Mr. Noel Dickerson's statement
7  indicated that he didn't sign -- I'm sorry.  I moved my head
8  down a little bit.  He didn't sign this hot work permit.  It
9  was either he or somebody from IWP, I think, who had subbed
10 their work out to CND.  And I don't know whose signature that
11 is, but if it was Mr. Dickerson's signature, I'd be surprised
12 that he was able to sign this at the end of the day if he was
13 involved in a fire event and burned, but he may have.  The
14 signatures look similar.  But as we get down at the bottom,
15 it has fire watch sign-off and final checkup, and those are
16 where the two signatures are -- two of the three signatures
17 on that page.
18     Q.  Okay.  Yeah.  Well, we won't -- you're not
19 intending to give handwriting analysis to -- expert opinion
20 in this case, right?
21     A.  No, I mean, you're -- I'm just answering your
22 question, so . . .
23     Q.  I know.  I'm just trying not to talk about
24 something that's not going to be at issue in trial.
25 That's -- whoever's signature it is, we can -- we can move

Page 32

1  on.
2      A.  Correct.
3      Q.  But you do know that -- that Mr. Noel Dickerson,
4  who was in charge for CND, and Dewayne Miller, walked the
5  room that morning, used their multi-gas meters, and did other
6  inspection work prior to this permit being issued, correct?
7      A.  Correct.
8      Q.  I mean, that's what's supposed to happen, right?
9      A.  Correct.
10     Q.  All right.  And do you -- did you see --
11     A.  Correct.
12     Q.  Well, in terms of the -- which things are covered
13 in the required precautions checklist, the -- whatever they
14 were looking at in the inspection pre-hot work progressing,
15 that was something that both Dewayne Miller and Noel
16 Dickerson did together?
17     A.  Correct.  They did it together, but Mr. Miller is
18 the one that's in charge, and he's the one that's got to make
19 sure everybody knows of all the hazards because he's there
20 for PLZ at their -- as their agent, I guess.
21     Q.  And -- and he -- but do you -- you've seen his
22 testimony and you see this checklist.  Do you know that there
23 was information exchanged, analysis done, to see whether or
24 not there was alarms on the multi-gas meter, or whatever it's
25 called, prior to the work beginning?  Right?

Page 33

1      A.  Correct.
2      Q.  I mean, we -- I'm not going to go back through what
3  you testified to the first time again, but the -- the cause
4  and origin of this fire was some type of flammable gas or
5  fume that contacted the slag, in your opinion, and caused the
6  fire event?
7      A.  Correct.  The slag fell down to the floor and
8  ignited vapors at the floor level and progressed from there.
9      Q.  All right.  And at the time that Dewayne Miller and
10 Mr. Dickerson did this at roughly 7 o'clock in the morning,
11 presumably, if there had been something there causing those
12 fumes, vapors, gas, whatever it was, the meter would have
13 detected that, correct?
14     A.  Correct.  If the - if the meter was down at that
15 level, yes.  I mean, it --
16     Q.  All right.  So --
17     A.  You know, if you spill gasoline, it normally comes
18 up about 12 inches off the ground.  So, yeah, I mean, you've
19 -- but you would expect to have some vapors and odors in
20 there if you had any type of combustible liquids or flammable
21 liquids filling the room, yes.  I would expect them to smell
22 it as well as the meter to detect it.
23     Q.  Okay.  Well, I mean, and -- and they've testified
24 to it.  But whatever it is, wherever they've placed that
25 meter around the room, at the time of the issuing of the

Page 34

1 permit, presumably, they didn't have any alarms on the meters
2 or they wouldn't have issued the permit, correct?
3    A.  I would hope not, yes.  I'd agree with that.
4    Q.  And you don't have an opinion that somebody ignored
5 a meter, you know, and said, Well, I don't really care that
6 this is going off, or anything like that, prior to issuing
7 this permit?
8    A.  No, I do not.
9    Q.  The room was clean -- I'll use that sort of
10 generically -- based on the metering at the time of the --
11 the issuing of the permit?
12    A.  Correct.
13    Q.  All right.  And you're not critical of the permit
14 being issued as it relates to, I guess, a fire hazard from
15 some sort of fumes if the room was clean at the time that it
16 was issued, fair?
17    A.  Correct.  I mean, at the time, there's obviously
18 discussion of who -- who knew whether or not those pipes were
19 clean or not.  Obviously, everybody believed they were clean
20 or I don't think they would have them in there cutting on
21 pipes that had flammable liquids in them.
22    Q.  Well, I think -- I hear what you're saying and I
23 appreciate that.  The -- the -- as I -- before we get to
24 anything more, did you see anything in the testimony --
25 forget this document for a minute -- that led you to believe

Page 35

1 that anyone ignored an obvious hazard or even not an obvious
2 that would be known to an expert prior to issuing the permit?
3 Meaning, there was something there that should've been
4 detected?  They didn't use the right meter or something along
5 those lines that you're critical of?
6    A.  I would say not that they knew of.  There's
7 obviously the question of the yellow and -- and red pipes
8 that are painted.  Whether or not, you know, we know when
9 those were exactly painted, you know, some were supposed to
10 be cleaned and not cleaned.  If it was the understanding that
11 those were painted early on and now they're -- all the pipes
12 are clean, then that would be the understanding.
13 Unfortunately, I don't think that was the condition they were
14 in, but that was what I think people understood it to be, is
15 this room had been cleaned and everything was safe.
16    Q.  Yeah.  And we'll -- at some point -- we talked
17 about this before.  I believe you've testified that you
18 believe that the source of the -- the flammable vapors or gas
19 or -- or fumes, it comes out of a pipe sometime during the
20 day.  Do you remember that?
21    A.  Yes.  Yep.
22    Q.  All right.  Let's -- let's put a dog-ear there, and
23 we'll come back to that.
24    But here, the -- the -- this permit indicates that
25 the work is being done, not by an employee, but by the

Page 36

1 contractor, right?
2    A.  The actual -- actual hot work operations, yes, it
3 was by -- it was by the subcontractor, CND.
4    Q.  Yeah.  I'm just going through the -- I'm going to
5 go through this form with you.  Okay?
6    A.  Okay.
7    Q.  All right.  So you see it says, Hot work being done
8 by --
9    A.  I see where you are, yes.
10    Q.  All right.  There's a -- there's a box for
11 employee, right?
12    A.  Yes.
13    Q.  And -- and then there's a box for contractor?
14    A.  Correct.
15    Q.  PLZ employees, in other words, were not doing this
16 hot work?
17    A.  That's correct.
18    Q.  All right.  It talks about where it was done in
19 Compound Room 2.  That's where the fire occurred, right?
20    A.  Yes.
21    Q.  And it was known that cutting and grinding was
22 going to occur?  That's what it says here, Nature of job?
23    A.  Yes.
24    Q.  I'm sure -- I'm assuming you're classifying this as
25 demolition, based on what your report says?

Page 37

1    A.  Yes.
2    Q.  All right.  And then it gives the CND again.  And
3 then it says, I verify the above location has been examined,
4 the precautions checked on, required precaution checklist has
5 been taken to prevent fire, and permission is authorized for
6 this work, right?
7    A.  Yes.
8    Q.  And then somebody signed it.  I'm not going to -- I
9 know you aren't a handwriting expert and haven't looked at
10 everybody's signatures anyway, but somebody signed off on
11 that, right?
12    A.  Yes.
13    Q.  All right.  And then the -- the day from 7:00 to
14 5:00 was -- was written down here as to when the hot work
15 would be done, right?
16    A.  Correct.  When this hot work permit was authorized,
17 it was between 7:00 a.m. and 5:00 p.m.
18    Q.  All right.  I know that the -- I know that you
19 mentioned that there was a time when the EMS was called.  Can
20 you say with a reasonable degree of scientific certainty, the
21 moment the ignition occurred, whether it was before or after
22 5:00 p.m.?
23    A.  I don't -- I can't.  I can't remember if the video
24 has the time stamp on it.  Typically, they would, but I don't
25 remember seeing it on there, so I can't tell you the exact

Page 42

1   A.  Yes.
2   Q.  All right.  In the -- do you have any reason to
3   believe that either Noel Dickerson or -- or Dewayne Miller or
4   anyone else that worked for PLZ knew that -- or had any
5   knowledge that there was any problem with the hot work
6   equipment that was being used -- used after inspection?
7   A.  Not that I'm aware of.  I mean, the guy signed off
8   that it was in good condition.  There is --
9   Q.  But --
10  A.  I mean, there is --
11  Q.  Do you have --
12  A.  -- placed on an acetylene line, but it didn't
13  appear to be leaking.  And then we had this crack, but we
14  don't know when the crack occurred in the oxygen piece.
15  Q.  I got that.  And you testified about that before.
16  I was trying not to go back through it, but it sounded like
17  to me that you didn't believe -- you didn't believe that --
18  you didn't believe that that played a role in the event, is
19  what I thought you testified to?
20  A.  I don't, and I still have that same opinion.
21  Q.  All right.  So you're not critical of PLZ or -- or
22  CND or Mr. Dickerson related to some failure to inspect the
23  hot work equipment, right?
24  A.  Correct.  I think we got indications they did and
25  -- and it was signed off by potentially two people that said

Page 42

Page 43

1   it was in good working condition.
2   Q.  All right.  But what I'm saying is, is you don't
3   have any information or evidence at this point that those
4   people didn't do an inspection, as required by the standards
5   you've cited?
6   A.  That's correct.
7   Q.  All right.  Whose equipment was it?  Do you know?
8   A.  CND.
9   Q.  All right.  So -- and then it goes on here and it
10  -- there's a -- the standards that you referenced talk about
11  35 feet of the work, right?
12  A.  Yes.  That's pretty typical, yeah.  You're going to
13  keep stuff at least 35 feet away from your point of
14  operations, essentially, where you're doing the torching and
15  cutting.
16  Q.  And the -- and someone from PLZ and someone from
17  CND went through and did the metering.  I believe Noel
18  Dickerson and Brian Dickerson testified that they did
19  metering of the area 35 feet around the work, I guess, right?
20  A.  Yeah.  They -- Noel Dickerson definitely said that
21  he had the meter in there.  Now, whether or not he's the one
22  that went around that morning, I think -- I don't -- I can't
23  answer that and say, Yeah, I know he did.
24      But someone went around with Mr. Miller and did
25  that and signed off on this, and then Noel Dickerson said

Page 43

Page 44

1   they had their own meter that they had on in the room.
2   Q.  Yeah.  Brian Dickerson testified that he took it
3   out -- a brand-new one out of the box and handed it to his
4   brother that morning, right?
5   A.  I believe so.  I didn't go back and review that for
6   today but, yes.
7   Q.  Well, I'll just ask you to assume that, but -- and
8   then they even -- they write down the -- the meter number and
9   the calibration date here in this hot work permit, correct?
10  A.  Yeah.  This one I thought was Mr. Miller's, but
11  maybe it's theirs.
12  Q.  They wrote down -- they wrote down the -- the
13  calibration date and the meter number as evidence that they
14  actually used the meter and did the -- that it was calibrated
15  appropriately to -- to check for flammable liquids or fumes
16  before the work started, right?
17  A.  Yes.  Somebody wrote it down, yes, I agree.
18  Q.  All right.  And then oxygen levels at 21 percent,
19  that's roughly room-air level, right?
20  A.  Yes.
21  Q.  And LEL percentage is 0.  What's LEL?
22  A.  Lower explosion limit.  So you're looking to make
23  sure you don't have anything that's getting close to where
24  you need to be.  Typically, a lot of -- a lot of these
25  chemicals are, you know, 1 1/2 to 2 percent.  You have to

Page 44

Page 45

1   have that much of it in there before you can ignite it.  And
2   were looking at 0 percent.  And, typically, the alarms go off
3   way below where -- say 2 percent, it would go off way below 2
4   percent before -- when you'd start getting an alarm, you're
5   not at the 2 percent that you would need to have an ignition.
6   You're below that level.  And we're at 0, so there's no --
7   nothing detected with the meter.
8   Q.  All right.  And then do you have any opinion that
9   between LEL percentage 0 at roughly 7:00 a.m. or right before
10  7:00 a.m. that morning, and when the liquid comes out of the
11  pipe, that there was anything else that created a higher
12  percentage than 0 of LELs?
13  A.  No, sir.  I'm not aware of anything.
14  Q.  All right.  And it's the event of when they grinded
15  or cut or unscrewed, or however they disconnected that pipe,
16  and the liquid material came out on the floor that we talked
17  about in your first deposition, it's still your opinion that
18  that's when the LEL percentage went up from 0?
19  A.  Yes.  In -- in the area of ignition, yes.
20  Q.  That's an event or a change that was not present at
21  7:00 in the morning?
22  A.  Correct.
23  Q.  And -- and it presumably happened, I don't know,
24  sometime in the later morning or after lunch before the --
25  the torch was lit?

Page 45

Page 50

1 is still closed?
2   A.  Not unless it's leaking.
3   Q.  Yeah. Okay. Well, let's assume it wasn't, it
4 wouldn't detect something being in there if we -- if we
5 assume that you're correct in your opinion, that later that
6 liquid that came out of the pipe, is what caused the LEL to
7 rise, then that event of the LEL rising was detectable by a
8 meter when they opened that pipe, cut it with a grinder, or
9 however they did it, and the stuff either came out on the
10 floor or, I guess, when they -- when they took the grinder
11 and cut it in half, right?
12   A.  Yeah. I mean, I'd -- I'd say it was unscrewed. If
13 they were cutting it with a grinder, they probably had an
14 event as they were grinding it, and it would have been more
15 in their face as opposed to being on the ground, you know, 6,
16 8, 10 feet below them. But, yes, once that pipe was
17 unscrewed and the liquid came out, then at that point, we've
18 got the flammable liquid spilled on the ground and we'd have
19 vapors coming off, depending on the temperature and the
20 concentration of the liquid.
21   Q.  And -- and because sometimes on work sites, hot
22 work or otherwise -- well, in hot work situations, in this
23 case demolition, the reason that the standards require the
24 contractor to do continuous monitoring, meaning around where
25 they're doing the work, is because new things can happen that

Page 51

1 creates an increase in -- in LELs or flammable liquid, right?
2   A.  Correct. Conditions can change, yes.
3   Q.  And I'm not going to go back through it because we
4 talked about it in your first deposition, but you agree with
5 me that if the -- if appropriately calibrated, turned on, and
6 in the location multi-gas meter was present at the time that
7 the pipes were open, however they were open, and this
8 material spilled out on the floor, that meter should have
9 detected or would have detected an increase in LELs, if
10 that's the source of them, right?
11   A.  Correct. If it's in the area where that liquid was
12 spilled out, yes. I would expect it to detect it.
13   Q.  I mean, and either the meter wasn't where it was
14 supposed to be or it didn't work if it didn't detect it, do
15 you agree?
16   A.  Correct.
17   Q.  I mean, is there any other explanation you can
18 think of for that?
19   A.  Again, it depends on how close you are and how much
20 of the vapors are coming off. So if I have a very heavy
21 vapor pressure on something that's heavier than air, it's not
22 going to be 3 feet off the ground. So do I take my meter and
23 stick it down at the ground, or do I keep it where I can hold
24 it in my face and look at it and it may not detect it? So it
25 depends on how close you are to that source of liquid.

Page 52

1   Q.  So this -- this material comes out of the pipes,
2 this liquid, right?
3   A.  Yes.
4   Q.  When CND is working in there, yes?
5   A.  Yes.
6   Q.  CND, according to Brian Dickerson, had a brand-new
7 multi-gas meter in their possession in the room, at least one
8 of them, maybe two, right?
9   A.  Yes.
10   Q.  All right. And -- but if they take that -- that
11 meter and they put it next to that liquid that's just come
12 out of the pipe, even if they don't tell anybody else, it
13 should detect if there's LEL increase, right?
14   A.  Yes. If it goes up above a detectable level, yes.
15   Q.  Do you have an opinion as to why -- strike that.
16       Do you have an opinion as to whether the -- CND
17 just failed to use the meter on the -- on the liquid that
18 came out of the pipe, the meter didn't work, or the meter was
19 too far away, or misused? Do you have an opinion as to which
20 of those are the reason why the LEL increase was not
21 detected?
22   A.  The most likely one, it was further away than where
23 the source of the liquid was. I mean, they talked about it
24 being on the outside of the room -- on the outer edge of the
25 room and they even talked about it being in eye -- eyewash.

Page 53

1 The eyewash was pretty well melted and burned after the fire
2 event. You can see it in the photographs where it's melted
3 down. So it's -- if the meter was in there, it probably
4 wouldn't detect where the liquid was coming out on the floor
5 over by -- underneath the tank.
6   Q.  So -- but -- so is -- am I hearing you say that the
7 -- CND did not have the meter where in -- it was supposed to
8 be?
9   A.  Well, in the close --
10      MR. ROGERS: Objection. Scott, we're here to
11   depose him regarding his supplemental opinion. You're
12   going back over stuff that we've already discussed in
13   his first deposition. So if you'd like to come back to
14   the standards that we talked about in his supplemental
15   opinion, that's what we're trying to base the remainder
16   of this deposition on.
17      MR. MASTERSON: Well, Eric, the -- I think that --
18   I think you don't want to debate me right now on why
19   we're here and what we're allowed to do. So you can
20   object and let's move on.
21 BY MR. MASTERSON:
22   Q.  Do you remember the question?
23   A.  I think so, yeah. I mean, they --
24   Q.  All right.
25   A.  -- they obviously didn't have it right next to the

Page 54

1  liquid. Otherwise --
2    Q.  All right.
3    A.  -- I would expect it to be going off.
4    Q.  You're not critical of anybody else in the world
5  other than CND for the fact that they didn't take the
6  multi-gas meter and put it over or around the material that
7  came out of the pipe to see if it alarmed, right?
8    A.  Well, correct.
9       MR. ROGERS:  Object to form.
10      THE WITNESS:  But if you look at -- Noel
11  Dickerson's description of it is they had liquid come
12  out prior to it earlier in the day and they had no
13  issues with it.  So he was told that this area had been
14  cleaned.  He had liquid come out, had no problems, and
15  unfortunately on one of the pipes, liquid came out that
16  was not okay.
17      So, I mean, if he had been aware that this -- these
18  did have flammable liquids in the pipes, I think he
19  probably would have taken a little bit more approach of
20  checking all the liquid coming out, as opposed to being
21  told everything was clean.  He had water coming out and
22  that's what he experienced earlier in the day.
23  BY MR. MASTERSON:
24    Q.  All right.  Did -- he had a tool available to him
25  to determine whether or not the LELs increased when that

Page 55

1  material went onto the -- the liquid went onto the floor of
2  the room, right?
3    A.  Yes.
4    Q.  Had tools available to him before he -- before he
5  lit the torch, right?
6    A.  Yes.
7    Q.  Did Noel Dickerson or Brian Dickerson testify that
8  they made a decision not to use the multi-gas meter because
9  someone had told them the pipes were clean as you just
10  testified to?
11   A.  No.  I don't think Mr. Noel Dickerson's been
12  deposed, and I don't think Brian Dickerson was fully aware of
13  what all had transpired earlier in the day because he was
14  working outside the room.  But no one has testified that,
15  Hey, we didn't use the meter.
16      Because it was -- to them, I -- my understanding
17  from them is it was on, it was in the room, it just wasn't in
18  close proximity to where the liquid is spilling out.
19   Q.  But in terms of the testimony you just gave a
20  moment ago where you said maybe they didn't use it because
21  they had been told the pipes were clean, that's not based on
22  evidence you've reviewed, that's just something that you're
23  saying is a -- is a possible reason?
24   A.  A possible reason, yeah.  Because
25  Mr. Noel Dickerson in his OSHA statement said they had liquid

Page 56

1  come out before and they didn't have any problems.  And so --
2    Q.  But why they -- sorry, I didn't mean to cut you
3  off.
4    A.  I said you'd have to ask him if -- you know, is
5  that the reason why he didn't take the meter and stick it
6  underneath the liquid and he just had it on in the room.
7    Q.  If there's a change in condition in a chemical
8  plant, meaning, liquid comes out of the pipe, am I safe to
9  assume that you would meter that material before you lit
10  something like a torch?
11   A.  I would, but if he's been told it's just water,
12  they may not.
13   Q.  Is --
14   A.  Somebody didn't, so . . .
15   Q.  Well, but -- but in the beginning hot work permit
16  process and under these standards, you're not supposed to
17  assume that because something has been true in the past, it's
18  going to be true that day, as it relates to demolition hot
19  work, are you?
20   A.  Correct.  But you're also going through the
21  procedure and that's what he's gone over, that this room is
22  clean and you've checked and you've got all the flammable
23  liquids out.  So if you've got flammable liquids in the
24  pipes, you shouldn't be in there doing torch cutting or
25  grinding on the pipes.

Page 57

1    Q.  Well, you -- you get a hot work permit, a new one
2  every day, right?
3    A.  Yes.
4    Q.  I mean, you don't -- you don't assume because in
5  Compound Room 1 the pipes are clean, that they're going to be
6  clean in Compound Room 3, or 4, or whatever it is, right?
7    A.  I agree with that 100 percent.  Yes, sir.
8    Q.  When -- when you -- when you -- when something
9  changes the conditions, or you start a job at a new place, or
10  even if you just come back the next day, you don't make
11  assumptions about what's there or not.  In your opinion, the
12  standards require that you follow the same procedure every
13  time so that you avoid accidents, right?
14   A.  I agree.  I don't think he was making an assumption
15  that the water was clean.  He was told it was clean.  So they
16  had -- he indicated they -- this was their second day in this
17  room working, Mr. Noel Dickerson did.  So, you know, they
18  didn't just assume that the liquid was clean.  They were told
19  it was clean.  They were told the room was safe to -- to work
20  in and given a hot work permit, which suggests there's not
21  flammable liquids in these pipes.
22   Q.  Well, at the time that the permit was given to them
23  there was no indication that there was flammable liquids in
24  the 35-feet radius, right?
25   A.  Yes.

Page 62

1  Mr. Miller told me.
2          But in hindsight, yes, if a liquid comes out, you'd
3  want to check it.  But it's -- it's -- the PAI -- PAI has to
4  approve where the work is being done.  So he has to know what
5  work is going to be worked on to be able to go in and say,
6  Yeah, this room is safe.
7          MR. MASTERSON:  Okay.  I'm not being rude, but I
8      move to strike the nonresponsive portion of that answer.
9  BY MR. MASTERSON:
10      Q.  What I was saying is, is the reason that the
11  contractor and the PAI work together in the pre-hot work
12  inspection is because the contractor knows what they're going
13  to demo that day and the PAI is supposed to make sure that,
14  within that 35 feet, they've gone through the checklist.
15      A.  Yes, I'm sorry.  I misunderstood.  I thought you
16  said it was just CND was in charge of all that to say this is
17  where everything is safe.
18      Q.  Well, CND was in charge of saying, This is the tank
19  I'm going to remove, or these are the pipes I'm going to try
20  to take out during this shift, or whatever it was, right?
21      A.  Yes.  And they're working in this room and -- and,
22  hopefully, the whole room would be safe, not just -- if
23  you've got a much larger area, yeah, you can say, All right.
24  I'm going to work in between these four columns, but we're in
25  a single room.  And from the center of that room, I think you

Page 62

Page 63

1  could probably put a 35-degree radius around everything and
2  encapsulate the whole room.  So, I mean, they're looking
3  inside this room, making sure everything's safe inside this
4  room, and I don't fault them for that.
5      Q.  I understood.  But what I'm -- what I'm saying is,
6  is that CND's part of the pre-hot work inspection would
7  include, you know, these are the things we're going to cut
8  on, or these are the pipes we're going to take out, or this
9  is the tank we're going to take out, or whatever it is that
10  they sequenced to do that day, right?
11      A.  Yes.
12      Q.  Okay.  And so, you know, they -- whatever it is
13  that Mr. Miller and Mr. Dickerson went around and metered
14  that day, presumably, it was tied to what was the work that
15  was going to be done that day?
16      A.  Yes.
17      Q.  You don't have -- you sort of mentioned this
18  casually.  I want to make sure I cover it.  You haven't seen
19  any indication that anybody from PLZ, Mr. Miller included,
20  told or instructed anybody at CND not to worry about or do
21  anything if liquid comes out of a pipe?  Nobody told them,
22  specifically, don't worry about it, did they?
23      A.  Not those specific words.  They were told that
24  everything was clean and they can work in that room.
25      Q.  All right.  But we've been through this before.

Page 63

Page 64

1  Making -- making assumptions -- well, the word "clean," even
2  when people do the best job they possibly can, is not 0
3  percent in a facility that makes chemicals, right?
4      A.  Well, I mean, that's why you triple wash to make
5  sure that it is down as close as you can to 0.
6      Q.  All right.
7      A.  Could there be some residual?  Yes.  But it's
8  not --
9      Q.  Yeah.
10      A.  -- not going to be detectable.
11      Q.  Well, presumably then, everybody was working under
12  the assumption that -- that there was some cleaning that
13  occurred.  Otherwise, why would you even need to do metering
14  for hot work if they thought it was 100 percent clean, right?
15      A.  Yes.  You verify that things haven't changed.
16      Q.  Right.  Well, that's -- that's exactly right.  The
17  reason you -- you do continuous monitoring is to verify that
18  things haven't changed?
19      A.  Yes.
20      Q.  All right.  And that is what the standards that
21  you've added to your opinions required, that if there is a
22  change that you -- the PAI ought to be notified and you start
23  over to make sure that there's -- things haven't changed
24  before you continue on with hot work?
25      A.  Yes.  That's one of the items on 51B that I quoted,

Page 64

Page 65

1  yes.
2      Q.  What is the difference between management and owner
3  under these standards, in your opinion?
4      A.  They're more or less one in the same in this
5  situation because we've got an owner of the facility as the
6  employer as well.  So there are -- say if you had a building
7  under construction, you may have an owner, but he's hired a
8  general contractor to manage the job.  In that case, you do
9  have an owner and a -- and a management company.
10      Q.  All right.
11      A.  But in this case, we've got an owner whose
12  employees, PLZ, are in charge of the decommissioning of this
13  plant.
14      Q.  Right.  They are -- the -- the PLZ employees were
15  not responsible for doing hot work, correct?
16      A.  They were responsible for authorizing the hot work.
17  They were not responsible for actively doing the hot work,
18  correct.
19      Q.  All right.  And in terms of the delegating or
20  contracting with some other entity to do hot work, you're not
21  critical of that, correct?
22      A.  Correct.
23      Q.  And CND is the hot work contractor for that day or
24  the applicable work that was being done?
25      A.  Correct.

Page 65

Page 66

1  Q. They were -- and contractors are responsible for
2  hot work operations that they're doing, correct?
3  A. Yes. That they're doing, correct.
4  Q. And a contractor -- what is a hot work operator?
5  A. An actual individual that's using the equipment,
6  that's creating the hot condition or the hot work activity,
7  torch cutting in this case.
8  Q. All right. Who was the hot work operator that
9  caused this fire, or the -- their -- their activity of doing
10 hot work ignited the fire?
11 A. CND was the hot work operator using the torch at
12 the time the slag ignited the vapors.
13 Q. Under Section 4.3 Hot work Operator, under 51B, CND
14 is the hot work operator, correct?
15 A. Yes.
16 Q. And do you know who specifically would be the hot
17 work operator?
18 A. In this case, I think it was Mr. Noel Dickerson was
19 using the torch.
20 Q. All right. And he had a permit -- a hot work
21 permit that he participated in the inspection in and had --
22 that was in place at the time of the hot work, right?
23 A. Yes.
24 Q. And then the hot work operator has an obligation to
25 examine and ensure that the equipment in this case he is

Page 67

1  using is in a safe and operating -- is in a safe operating --
2  excuse me -- is in a safe operating condition, correct?
3  A. Yes.
4  Q. If something's wrong with it, the hot work operator
5  is responsible for repairing it or getting it repaired by
6  qualified personnel --
7  A. Yes.
8  Q. -- prior to being used?
9     All right. And the hot work operator, in this
10 case, CND, Noel Dickerson, under the standard that you've put
11 in your supplemental report shall cease hot work operations
12 if unsafe conditions develop and shall notify management, the
13 area supervisor, or the PAI for reassessment of the
14 situation, correct?
15 A. Correct.
16 Q. All right. Did, to your knowledge, Noel Dickerson
17 notify -- or I think you've already testified he didn't
18 notify -- you haven't seen evidence he notified anybody at
19 PLZ. Did he notify any other contractor or management
20 on-site of the change in the condition?
21 A. No, he wasn't aware that it was an unsafe
22 condition. I mean, that's -- I mean, that's what we have,
23 the issue of why we have a flammable liquid on the ground.
24 He was unaware that that was an unsafe condition.
25 Q. Okay. Did he say -- did he testify to that?

Page 68

1  A. No, he didn't. In his statement, he said they had
2  water in there before and -- and didn't have any issues with
3  it earlier in the day. So --
4  Q. Did he -- sorry.
5  A. -- your logic says that if he had water before and
6  didn't have an issue when the water came out this time, he
7  didn't see that as an issue.
8  Q. Do you think a hot water -- excuse me -- a hot work
9  operator should be trained to not make assumptions that
10 because the day before the water didn't cause any issues that
11 that doesn't mean it won't cause issues the next day in a
12 chemical plant doing demolition?
13 A. No. I mean, I wouldn't recommend that, no. But
14 that's also part of PAI's responsibility, to make sure that
15 the contractors that are authorizing to do hot work permit
16 understand all those issues and understand what the policies
17 are and understand what the standards require. I mean,
18 that's part of his job of authorizing someone to come in
19 there and do the work. If they're not --
20 Q. If Noel Dickerson --
21 A. -- qualified to do it, then you don't give them a
22 hot work permit.
23 Q. Have you analyzed or formed an opinion about Noel
24 Dickerson's qualifications?
25 A. No. I'm just going by what's -- what's in his OSHA

Page 69

1  statement.
2  Q. If Noel Dickerson testifies that he knew that if --
3  that he should not make assumptions about water, or new
4  material being introduced, or a changing condition, that he
5  should -- he should meter or notify somebody, get help, or
6  something, if there's a change in condition, do you agree
7  that if he failed to do so that that's his fault and not
8  somebody else's fault?
9  A. Correct. If he knew that this -- if he knew that
10 this was changing and there was a possibility that this would
11 be a flammable liquid, yeah, he should go get somebody. But
12 I don't think he would continue to work on something if he
13 knew it was an unsafe condition when he's the one that's
14 actually got the torch in his hand. But you'll have to ask
15 him what his mindset was at the time.
16 Q. All right. If he -- all right. And I think I'm
17 clear on this, but your opinion is that PLZ is somehow
18 responsible because Noel Dickerson, who had a multi-gas meter
19 in the room with him, at least one of them, made the
20 assumption that that water was safe because he hadn't had
21 problems with it the day before, and therefore he could light
22 the torch and go on with his work? Is that -- is that what
23 you've reached as a factual conclusion about what happened
24 here?
25 A. They're a contributing factor to that, yes.

Page 70

1  Q. What does that mean?
2  A. That they contributed to it. I mean, they've got
3  someone in here, they tell him the water's -- there's only
4  water in here. He said it was earlier that day, I don't
5  think it was the day before. I think it was earlier that day
6  he had water leak out, didn't have any issues, the water
7  leaked out after lunch. He's making the same assumption that
8  he doesn't smell anything and realized that it was likely
9  safe as it was earlier in the day. Had he been told that
10 this was a flammable liquid in his pipes, then I don't think
11 he would -- I would not expect him to continue to work if he
12 knew that this was creating an unsafe condition.
13 Q. Well, he knew it was flammable liquid in the pipes
14 to begin with, right?
15 A. At some point prior to them being cleaned, yes. I
16 mean, there are acetylene, and xylene, and a few other
17 chemicals in there that were flammable.
18 Q. Okay. You're -- can you point me to any evidence
19 where Brian Dickerson, or Noel Dickinson, or anybody else on
20 the CND crew, asked somebody at PLZ, Hey, some material is
21 coming out of this pipe. Should we be concerned, or should
22 we do something different, or anything along those lines?
23 A. No. It's just all we have from Noel Dickerson in
24 his OSHA statement that it had come out earlier and he did
25 not have a problem with it.

Page 71

1  Q. Have you spoken to Noel Dickerson?
2  A. No, I have not.
3  Q. All right. Have you asked Plaintiff's counsel if
4  you could talk to Noel Dickerson as the Plaintiff's other
5  area he represents?
6  A. No, I think he's got his own attorney. So I have
7  not gone through that aspect of it.
8  Q. All right. Have you -- have you -- other than the
9  OSHA statements, have you seen any other testimony,
10 affidavits, or anything else from Mr. Dickerson?
11 A. No, sir. I mean, I -- I said I talked to Brian
12 Dickerson early on and then I have reviewed his deposition.
13 Q. All right. And I asked you whether or not you had
14 seen any evidence to base an opinion on that Mr. Dickerson,
15 either Mr. Dickerson, asked somebody at PLZ whether they
16 could disregard water coming out because it was, quote, safe
17 or not. And you said you had not seen that, correct?
18 A. Correct.
19 Q. Have you seen any testimony or documentation or
20 evidence that would support an opinion that PLZ instructed
21 CND not to worry about new water or new liquid coming out of
22 a pipe and to just go on with their work? Have you seen any
23 evidence --
24 A. Not like that, no, sir. They were just told that
25 it was -- the room was clean.

Page 72

1  Q. All right. Do you know how they were communicated
2  that?
3  A. Mr. Dickerson says when they were walking around,
4  that they were -- that the room had been cleaned and they
5  were allowed to start their demo in that room.
6  Q. No, but you're saying that they were told the room
7  was clean. I'm saying, who told them that?
8  A. Probably Mr. Miller, whenever he was going around
9  with Mr. Dickerson.
10 Q. You know that I'm not going to accept probably in
11 this situation. Do you know for a fact that somebody from
12 PLZ said that? Do you have a factual basis to base this
13 opinion on that somebody said those words to them?
14 A. No. I was not there, sir. I can't give you a
15 factual reminiscent on what happened. I'm just trying to go
16 by what's in Noel Dickerson's statement to OSHA.
17 Q. Okay. I understand, but what you're saying is, is
18 that the reason he went on with his work is because he hadn't
19 had a problem earlier in that day or the day before, and he
20 was told it was clean. What I'm asking you is, who -- who --
21 what testimony are you relying on for the proposition that
22 somebody from PLZ, or otherwise, some other company, told Mr.
23 Dickerson not to worry about liquid coming out of the pipes
24 because it was clean?
25 A. Not in those words, no, sir. I'm not aware of

Page 73

1  anything.
2  Q. What about in any other words it's clean?
3  A. Well, just that the room was clean.
4  Q. Yeah, but who -- who said that?
5     MR. ROGERS: Scott, I believe both Lancaster and
6  Miller testified to that.
7  BY MR. MASTERSON:
8  Q. What -- what is the basis --
9  A. I'm looking at Mr. Dickerson's OSHA statement where
10 he says, They just told us that the room was clear and we
11 were able to work in there. Dewayne Miller gave us approval.
12 Q. That the room was clear, not clean, right?
13 A. Yes.
14 Q. All right. And so do you know what -- do you know
15 what clear or clean was based upon?
16 A. It depends on, I guess, what reference you want to
17 look at. The HERR documents that were in, what, November
18 22nd, 2019, when they said they were finished cleaning Room
19 -- Mixing Room 2. And that's --
20 Q. All right.
21 A. -- that's my words. I'd have to quote it to you,
22 and I've got it printed out here somewhere.
23 Q. Right. Well --
24 A. Their exact terminology was they had cleaned the
25 interior, the pipes that fed the tanks in Room -- Mixing Room

Page 74

1  2 when they were finished and ready to go on to the next
2  room.
3      Q.  All right.  And these standards -- I just want to
4  leave no question about this.  These hot work standards that
5  you've referenced in your supplemental report, they're
6  specifically designed to avoid making assumptions -- or at
7  least in part, they're designed to -- specifically to -- to
8  keep people from making assumptions about whether an area is
9  safe for hot work or not, right?
10     A.  Yes.  I mean, that's -- like I say, that's exactly
11 what it says.  When conditions change, then you look at it.
12 And if you're aware of an unsafe condition, you go tell
13 somebody.
14     Q.  Are you letting Noel Dickerson off the hook for not
15 metering or notifying someone or asking for help after -- I
16 think it was a bunch of water came -- or liquid came out of
17 those pipes?
18     A.  Yeah.  I haven't gone back.  When we say, "a bunch
19 of water," I think someone made reference, maybe Brian, it
20 may be 30 gallons.  That's a -- that's a lot of water.  But
21 that's the words he used.  I haven't gone back to calculate
22 the volume of a pipe to see how much would come out of a
23 section of pipe.  I don't think it'd be 30 gallons of pipe.
24 But water came out -- no, I'm not letting him off.
25         You know, being an owner of CND, I would expect him

Page 75

1  to have someone closer to it, but if it's his experience
2  working in there that these were safe conditions, then he
3  made the, as you say, the assumption that this water was
4  water, but unfortunately it was not.
5      Q.  And -- and to -- for him to make sure it was safe,
6  it was simple as walking over to that eyewash, getting that
7  meter out of it, and holding it closer in proximity to this
8  30 gallons, or however many gallons it was, that came out of
9  the -- the pipe, right?
10     A.  Yes.  It could be that easy, yes.
11     Q.  I mean, is there any question in your mind that he
12 shared some responsibility for making the assumption instead
13 of using that tool?
14     A.  No, I don't.
15     Q.  There's no question in your mind, right?
16     A.  Yeah.  I mean, he'd have some contribution to it.
17 That's a jury's decision as to how much, but, yes, I would
18 say that if I had a meter and I got liquid coming out here,
19 if I thought it was a concern or if I smelled something, then
20 yeah, I would take a meter over and -- and check it.
21     Q.  And is that something -- you said that a couple
22 times now.  Do you believe that the percentage of LELs or
23 flammable liquid -- that it should have been detectable by
24 smell?
25     A.  Most of it, you'd smell it long before it gets to

Page 76

1  the LEL, yes.
2      Q.  Yeah.
3      A.  Gasoline, well below the LEL.
4      Q.  Well, that's what I'm saying.  If somebody left
5  toluene, or xylene, or something like that, these pipes --
6  I'm just using the words you used earlier.  I don't remember
7  what was in this particular --
8      A.  Yeah.  That's two of the easy ones to remember.
9      Q.  Yeah.  But if -- if those are -- just using those
10 examples or similar materials, I mean, wouldn't you think
11 that if 30 gallons of it came -- or 30 gallons of liquid,
12 some of which was that material, that you would have been
13 able to smell it in the room?
14     A.  If it -- the first part of that question, if it was
15 all toluene, yes.  Or xylene, yes.  I would expect the whole
16 room to smell.
17     Q.  Well, yeah.
18     A.  I'm saying, if the -- now, if it's 5 percent,
19 you're probably going to smell it.  You know, they had
20 circulation fans on, so it may not migrate up to the
21 mezzanine level as well as it would be at the lower level.
22 So they may not smell it up on the upper mezzanine level.
23 But if you're down underneath it, you may smell it, yes.
24     Q.  Well, under -- was it 2 percent that this -- it
25 detects?

Page 77

1      A.  2 percent is typically an LEL.  That's a rough
2  number, and you're -- you're below that number whenever it
3  starts detecting.  I mean, the alarms go off before you get
4  to the 2 percent, so whatever the -- the meter has.  So it'd
5  be less than that.
6      Q.  So let's just -- sorry.  I interrupted you.
7  There's -- so let's just use -- let's use 30 gallons.  Okay?
8  I'm just -- we'll just -- I don't know whether that's true or
9  not.  The jury will have to figure out whether they believe
10 that, but I'm -- let's just use that number.
11         If you have 30 gallons of water and there is 2
12 percent one of the zines, benzyne, toluene, xylene,
13 something, before it -- I thought you said before it got to
14 the level that it would detect, you would expect to be able
15 to smell it if you're standing on the ground, let's just say,
16 right?
17     A.  Yes.  Correct.
18     Q.  All right.  There was a CND employee on the ground,
19 right?
20     A.  Yes, over by the doors.  Which, you've got to
21 remember, the fans are pulling that vapor out the exterior
22 wall and he's over by the doors.  So he -- he's not going to
23 have that same vapor coming back to the doors as he would be
24 if you're under the tank or towards the outer wall.  You can
25 see that clearly by the smoke patterns whenever it does

Page 78

1  ignite. You don't have fire -- describe it out for you. You
2  don't have smoke coming out those doors because the fans are
3  pulling it out of the exterior wall where the fans are on.
4         So as vapor comes down, it could easily go out that
5  door. And a person standing at the door wouldn't smell it --
6  or I guess that would be another reason your meter may not
7  have gone off if it's on the interior wall and the fans are
8  sucking the vapors out the exterior wall.
9     Q. Did you do -- if you have it within 10 feet, it's
10 going to go off as the stuff goes by, right?
11    A. If you're in the -- in the stream of the -- of the
12 vapor -- of the air moving, yes. If I'm -- we'll say
13 interior and exterior, if I'm on the interior side where the
14 forklift was, and the water liquid came out underneath the
15 tank, and it's being pulled outside, you may not -- you may
16 have to be closer than 10 feet just because the vapors are
17 being pulled out.
18    Q. Did you do any scientific testing to determine
19 whether or not the vapors were detectable by nose by any of
20 these individuals in the room upon coming out of the pipes?
21    A. No, I haven't done any scientific testing. It's
22 just based on experience of growing up in a chemistry lab and
23 smelling propane and other chemicals in -- in this kind of
24 work. But my dad was a chemist, so I've been in a chemistry
25 lab since I was 11 years old using toluene and everything

Page 79

1  else to clean things, acetone. So, yeah, you can smell it
2  pretty easy.
3     Q. Well, I know. I understand that. I mean, but it's
4  not based on anything beyond that? Meaning, you didn't do
5  any scientific analysis in this case to determine whether or
6  not one of the Dickersons or the other guy that drove the
7  forklift should have been able to smell this stuff or could
8  have smelled the stuff if you assume, you know, 2 percent of
9  30 gallons of liquid coming out of a pipe?
10    A. I agree. I have not done anything. I'd be -- I
11 mean, again, with taking into consideration the fans pulling
12 the vapors out of here, you may not until you -- you get
13 right on top of it.
14    Q. Is the --
15    A. So I -- I can't say that they would smell it.
16    Q. Or not, right?
17    A. Or not, yeah, correct.
18    Q. Got it. That's all I wanted to know. Now, the
19 fans -- you're not critical of the fans being on, are you?
20    A. No. I would suggest they would be on just to help
21 clear any odors or any other smells that may come in there.
22 You know, when you're torch cutting stuff, it's -- it smells.
23 You've got hot metal, you're getting an odor, you don't want
24 it filling the interior of the building. So having the fans
25 on to suck the vapors out would be a good thing to have for

Page 80

1  odors.
2     Q. And it's your -- and it's your opinion -- so forget
3  where they were standing up on the mezzanine. But 30
4  gallons, 10 gallons, 20 gallons, 5 gallons, whatever it
5  actually is that comes out of a pipe by volume, comes out on
6  the floor, there's -- and it's at the detect level or the
7  point where it will actually combust, as occurred in this
8  fire event. Is it your opinion, more likely than not, that
9  if you walk down from the mezzanine and stick your nose right
10 above this liquid that you should be able to smell a chemical
11 if it's present?
12    A. If I was that close to it I would expect to smell
13 it, yes.
14    Q. All right. And then, obviously, if you get the
15 meter within 10, or 12, or whatever you testified to earlier,
16 feet it should also detect it, right?
17    A. I'm thinking more stagnant, but yes. It depends on
18 the meter, but if I've got vapors being pulled outside to the
19 exterior wall and I'm on the interior wall, I may very well
20 not get it because it's all being pulled out of the room.
21 I've got fresh air coming in those -- the roll-up door and
22 the man door coming. That's fresh air coming in, being
23 pulled outside.
24    Q. Yeah, I understand. But the fumes had not all
25 dissipated prior to the torch being lit because -- or really

Page 81

1  the I-beams being cut, right? I mean, they were still there.
2     A. Correct. The liquid was there and it was -- the
3  vapors are coming off of it, yes. You would --
4     Q. If that's the --
5     A. If you put the meter right up next to that liquid,
6  I would expect it to go off. If I'm standing 10 feet away,
7  it depends on where I am whether or not I would smell it or
8  my meter would go off.
9     Q. But there's a new puddle of 30 gallons of water on
10 the ground. If you put your nose above that water when it
11 comes out of the pipe, you're going to be able to smell
12 something if it's at the combustible level of fumes, yes?
13    A. I would think you would, yes. At the pipe, yes.
14    Q. And the -- and same thing with the meter. If you
15 put the meter over it, it's going to detect it?
16    A. Yes.
17    Q. If you smell something -- forget the meter. Okay?
18 If you smell something that smells like a chemical, even if
19 you previously thought that the -- the pipes were clean, or
20 close to clean, or whatever, certainly in that instance you
21 should notify the PAI, right?
22    A. Yeah. PAI or check it yourself, yes.
23    Q. Yeah. I mean, and the -- and get -- and you have
24 to -- you're supposed to -- the operator, CND in this
25 instance, is supposed to get their approval for proceeding

Page 82

1  when there's a new condition develop?
2     A.  A new on-site condition, yes.
3     Q.  Well, smelling -- smelling, using your nose, using
4  Noel Dickerson's nose or Brian Dickerson's nose, smelling a
5  chemical in 30 gallons of water that just came out of a pipe,
6  at least from the standpoint of common sense, would be
7  something that one might consider unsafe and get help on; is
8  that fair?
9     A.  Yes, correct.
10    Q.  Now, on the next page, Management, contractors, the
11 PAI, the fire watch, and the operators shall recognize their
12 mutual responsibility for safety in hot work operations,
13 right?
14    A.  I'm not sure where you are, but I think so.  If
15 you're reading it, I'm -- I agree with you.
16    Q.  I wouldn't -- I wouldn't do that.  I wouldn't
17 misread it to you.  I'll tell you -- I'll tell you where I
18 am, though.  I'm on -- 51B-7 is the page, I guess.  Wait,
19 hold on.  No, I don't see a page number.  Oh, yeah, I do.
20 51B-7 is the page number or reference number up by fire
21 prevention precautions in the 2019 NFPA 51B.
22    A.  What -- do you know what section?  5.5 or 5.7?
23    Q.  No, no.  It's 4 -- it's -- I'm under -- I'm still
24 in hot work operator.
25    A.  Okay.

Page 82

Page 83

1     Q.  Okay.  It's the very last one.
2     A.  4.3.  Okay.  I got you.
3     Q.  4.6, Mutual responsibility, Management,
4  contractors, the PAI, the fire watch, and the operators shall
5  recognize their mutual responsibility for safety in hot work
6  operations.
7     A.  Yes.
8     Q.  All right.  And here under this standard, it
9  applies to operators like Mr. Dickerson, right?
10    A.  Yes.
11    Q.  He's supposed to know and recognize his mutual
12 responsibility for safety in doing the hot work he was doing
13 that day?
14    A.  Yes.
15    Q.  All right.  And the -- and there's no question if
16 -- if they had -- they had gone to PLZ, Mr. DeWayne Miller,
17 or somebody else, if they had said, Hey, there's all this
18 water that spilled out on the ground.  PLZ would certainly
19 have had a responsibly to go and meter or smell or do
20 something to determine whether it was safe to continue,
21 right?
22    A.  I would think so, yeah.  But if they're under the
23 impression this is a clean room, they may or they may not.  I
24 -- I mean, we don't know.  But, yes, I would agree that that
25 would be their responsibility to go check and make sure this

Page 83

Page 84

1  room is safe to continue working in.
2     Q.  But why -- why -- well, and we're -- we're, at this
3  point, speculating a little bit about what people would have
4  done because they hadn't -- PLZ wasn't notified to get to
5  make that call related to this 30 gallons of liquid coming
6  out, fair?
7     A.  Correct, yes.
8     Q.  All right.  And then in 51B-7, can you point me to
9  any other instance or violation, I guess, of this standard,
10 in your opinion, by DeWayne Miller, or somebody else, or
11 anybody else at PLZ?
12    A.  I'm not sure I understand that question.
13    Q.  Yeah.  Did -- did PLZ violate the standard that
14 you've put in your supplemental report the day of the
15 accident?  They issued the permit.  We've been through that.
16 They weren't notified of any change in condition.  Did they
17 do anything before the -- between the -- when the hot work
18 permit was issued and the fire event that violated this
19 standard, in your opinion?
20    A.  Well, I mean, they -- they issued a permit for a
21 room that had a flammable liquid in it.  And so, you know,
22 we're not in compliance with the permit that says they're 35
23 feet away because they're in the room.
24    Q.  Did -- well, did you know -- did PLZ, DeWayne
25 Miller, know that there was flammable liquid in the room at

Page 84

Page 85

1  the time they issued that permit?  Have you seen any evidence
2  of that?
3     A.  I've not seen any direct evidence that he was aware
4  of that, no.
5     Q.  Okay.  Have you seen any evidence that -- well,
6  we've been through this.  I think you told me the metering
7  did not determine the presence of any flammable liquid in the
8  room, correct?
9     A.  Correct.  And, like I said, we assume they did it
10 properly.
11    Q.  And you haven't done any scientific testing -- I
12 think you told me earlier you don't -- you don't know exactly
13 the volume that would come out of a pipe, but in terms of
14 sourcing the material that came out of a particular pipe,
15 whether it was in the room or out of the room and -- and
16 traveled into the room when the pipe was, you know, cut down
17 and -- unopened or unscrewed, did you do any kind of analysis
18 to see where the liquid was and how it -- how much of it
19 could have been in the pipe, or what the source of that
20 liquid was, or anything along those lines?
21    A.  I mean, not scientific testing of recreating how
22 much water came out of a pipe, no.  We've looked at the
23 testing that was done that showed that there were multiple
24 pipes that had flammable liquids in them.  Which one was
25 unscrewed and how much exactly came out, I can't tell you.  I

Page 85

Page 94

1 somehow or another that day, didn't he?
2   A. Well, the end of the pipe, yeah, but not the open
3 end. To put the meter at the open end is -- is over against
4 that cinder block wall. Where they were unscrewed is
5 directly above the mezzanine.
6   Q. Yeah. Well, when -- I mean, if you're -- if you
7 believe Dickerson should have metered the end of the pipes --
8 or somebody should have metered the end of the pipes if they
9 wanted to know what was in them, right?
10   A. Yeah. If they weren't -- if they weren't aware
11 that they were supposed to be clear or clean.
12   Q. Well, but they -- they did the hot work permit
13 process together before the shift began?
14   A. Yes.
15   Q. Why would you do -- under your logic, why would you
16 do that if you were going to just make the assumption it was
17 clean?
18   A. To make sure that nothing's changed, to make sure
19 there's not a vapor leak or a glass leak.
20   Q. Well, absolutely. And so the -- and so they --
21 when something leaked and you have visual evidence, if not
22 nasal or smelling evidence, that something has come out of
23 that pipe, I mean, then they -- that's why they should have
24 metered or notified the PAI when that occurred, right?
25   A. Yes. And -- if they considered it to be an unsafe

Page 94

Page 95

1 condition, yes. If they looked at it and couldn't smell
2 anything and assumed it was just water like it had been and
3 what they were told, this room's clear to -- to work in,
4 yeah. I mean, ideally, yeah. In hindsight, put your meter
5 underneath the tank and -- and keep it there. But,
6 unfortunately, that didn't happen, and we're here today
7 because there was a flammable liquid in this pipe that no one
8 was aware that was in there.
9   Q. Well, if -- even if somehow HERR and PLZ conspired
10 to keep Dickerson's -- the Dickerson's from knowing before
11 they started their work, they -- they were in -- in on it
12 together and they -- they were lying to them and told them,
13 Look, don't worry about the water. You know, no big deal.
14 Go about your hot work with your torch. Get the -- get these
15 I-beams and tanks out of here. We don't really care about
16 your safety.
17       If you assume the entire worst about them, okay,
18 and that everything those two companies did up to that point
19 was diabolical in nature, okay, if -- don't you agree with me
20 that if, when the water comes out of the pipe, Noel Dickerson
21 takes his meter and puts it on there and it detects LELs, and
22 he then does not light his torch, that this accident does not
23 happen?
24   A. I agree with you.
25   Q. Let's take a break. I think those are all my

Page 95

Page 96

1 questions. I just want to take just a minute.
2       THE VIDEOGRAPHER: Stand by, please. The time is
3 5:04 p.m. We are off video record.
4       THE COURT REPORTER: Mr. Masterson, are you going
5 to be ordering the transcript?
6       MR. MASTERSON: Yes, ma'am.
7       MR. WARD: I'll take a copy.
8       THE COURT REPORTER: Okay. And, Mr. Rogers?
9       MR. ROGERS: I don't need the video. This is Eric
10 Rogers. I will take a copy of the transcript.
11            * * *
12    (Whereupon, the deposition ended at 5:04 p.m.)
13    (Pursuant to Rule 30(e) of the Federal Rules of Civil
14 Procedure and/or O.C.G.A. 9-11-30(e), signature of the
15        witness has been waived.)

Page 96

Page 97

1       D I S C L O S U R E
2
  STATE OF GEORGIA    Deposition of BRYAN DURIG, Ph.D., P.E.
3
4 COUNTY OF HENRY    MONDAY, MARCH 14, 2022
5
6 Pursuant to Article 8.B of the rules and regulations of the
7 Board of Court Reporting of the Judicial Council of Georgia,
8 I make the following disclosure:
9
10 I, Kathryn Taylor, am a Georgia Certified Court Reporter. I
11 am here as an independent contractor for Veritext Legal
12 Solutions.
13
14 Veritext Legal Solutions was contacted by Lewis, Brisbois,
15 Bisgaard & Smith, LLP, to provide court reporting services
16 for this deposition. The firm will not be taking this
17 deposition under any contract that is prohibited by O.C.G.A.
18 15-14-37(a) and (b).
19
20      *Kathryn Taylor* (signature)
21      _____
22      KATHRYN TAYLOR, CCR
23      No. 5082-8490-7080-9088
24      CERTIFIED COURT REPORTER
25

Page 97